**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 24-12479

Non-Argument Calendar

————————————————

AKEEM MUHAMMAD,

*Plaintiff-Appellant,*

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

*Defendant,*

BOYCE TURNER,

Correctional Officer,

*Defendant-Appellee.*

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00467-WS-MAF

————————————————

Before BRANCH, GRANT, and HULL, Circuit Judges.

HULL, Circuit Judge:

Akeem Muhammad, a Florida state prisoner, appeals the grant of summary judgment to Officer Boyce Turner of the Florida Department of Corrections ("FDC") on his claims under 42 U.S.C. § 1983 that Turner used unnecessary and excessive force against him on May 9, 2019, in violation of the Eighth Amendment.

In granting summary judgment, the district court determined that video footage of the incident clearly contradicted and disproved Muhammad's version of events and no genuine dispute of material fact existed. On appeal, Muhammad argues, *inter alia*, that the district court erred because the video supports his account or, at a minimum, is ambiguous and rife with gaps and obstructed views of the incident. Given his affidavit and deposition, Muhammad contends the record as a whole presents genuine issues of material fact as to the May 9 events.

After careful review, and with the benefit of oral argument, we conclude the video does not clearly or blatantly contradict Muhammad's version of events, and genuine issues of material fact exist that preclude summary judgment for Officer Turner.

## I. FACTS

### A. Record Evidence

The record evidence primarily consists of: (1) Muhammad's affidavit and deposition; (2) Officer Turner's declaration and responses to interrogatories; (3) other officers' incident reports; (4) a video of the incident from a prison security camera; (5) a video of a nurse examining Muhammad after the incident from a

handheld camera; (6) Muhammad's medical records; and (7) a declaration from Dr. Shaundel Boyce, a prison psychiatrist.

The parties hotly dispute what events occurred, in what order, and even what the videos show or do not show. At this summary judgment stage, we recount the facts in the light most favorable to plaintiff Muhammad, unless the video evidence clearly or blatantly contradicts Muhammad's version of events. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (explaining that when a video recording of an incident "blatantly contradict[s]" a party's stated version of events, courts should view the evidence in the light depicted by the video evidence); *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony [will be viewed as] incredible."); *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) ("So, as we must while reviewing the district court's ruling on summary judgment, we have credited Plaintiff's version of the record evidence where no obviously contradictory video evidence is available.").

Additionally, where a video is unclear or contains ambiguities, "we must construe [them] in favor of [the non-moving plaintiff]." *Castro-Reyes v. City of Opa-Locka*, 166 F.4th 886, 890 (11th Cir. 2026). And "if the [video] recording renders a party's story merely unlikely yet does not necessarily contradict it, the default rule kicks in: we must accept the [non-moving] party's version for purposes of considering the motion for summary judgment." *Brooks v. Miller*, 78 F.4th 1267, 1278 (11th Cir. 2023).

To be clear, the facts as we recount them are not necessarily true, historical facts or what a jury may ultimately find. Instead, the facts at this stage are what a reasonable jury could find from the evidence and videos viewed in the light most favorable to the non-moving party, Muhammad. *Castro-Reyes*, 166 F.4th at 890.

## B.    Events Prior to the May 9, 2019 Incident

At all relevant times, Muhammad was a prisoner at Florida's Zephyrhills Correctional Institution (the "prison") and was classified for solitary confinement. Muhammad states that (1) FDC policies require him to be handcuffed when he is outside of his cell; and (2) since November 2012, Officer Turner is the only FDC employee to issue a disciplinary report against Muhammad for disobeying an order.[1]

On May 8, 2019, Muhammad submitted a grievance alleging mistreatment of inmates by unspecified correctional officers in the mental health unit where Muhammad was housed. The grievance also alleged that the prison psychologist, Dr. Shaundel Boyce, "was allowing officers to mistreat inpatient inmates housed in [the mental health unit]."

---

[1] Muhammad's affidavit, dated January 31, 2024, states: "From 11-16-12 to the present, only one officer or FDC staff wrote a disciplinary report against me for disobeying a verbal or written order (a 6-1 infraction); and that officer was Defendant Boyce Turner . . . ."

## C.    L-Wing Unit's Common Area

The May 9, 2019 incident took place in the common area of the prison's L-Wing mental health unit.  As the video shows, that unit has a large, open common area in the center, with individual cells located at the periphery.  In the middle of the common area, there is a single table ringed by metal stools, which are all connected to the table.  The individual cells have windows spanning the top-halves of the doors.

The video of the incident came from the security camera in the unit's common area.  The camera was mounted high in a fixed position, looking down into the common area with the interior of cells partially visible.  Because of this vantage point, the video from this security camera (1) is rife with obstructed views and (2) has audio that is difficult to hear and decipher.  The video thus lacks meaningful audio to capture key dialogue during the incident.

## D.    The May 9, 2019 Incident

On May 9, 2019, just prior to the incident, an officer led another inmate out of the cell adjoining Muhammad's cell in the L-wing unit.  The inmate was not handcuffed.  The officer escorted this uncuffed inmate out of his cell, through the common area, and off-camera (presumably exiting the unit).  Once that inmate exited, no other inmates were visible to the security camera.

About a minute later, Officer Turner and other correctional officers entered Muhammad's cell to search it.  According to Muhammad, typically before entering a cell, officers handcuff an inmate, like Muhammad.  To do so, the officers order the inmate

to approach the cell door.  Then, the officers unlock a slot in the door and open it.  The inmate turns around, puts his hands behind his back, and feeds his hands through the slot so the officers can place handcuffs on the inmate's wrists.

On May 9, the officers did not follow this protocol prior to opening Muhammad's cell door, which "frighten[ed]" Muhammad "because officers had never before opened [his] cell door without first handcuffing [him]."  However, once inside Muhammad's cell, the officers eventually ordered Muhammad to submit to handcuffs behind his back, which he did.

After Muhammad was in handcuffs, Officer Turner told him in an aggressive tone that Dr. Boyce (the prison psychologist) "doesn't like that grievance you wrote yesterday and you're going to pay for it."[2]

Officer Turner then led the handcuffed Muhammad from his cell with a grip on Muhammad's left arm, and they stood in front of the common area table together.  Officer Turner and Muhammad were positioned with their backs to the security camera.  Once they were at the table, Muhammad avers that

---

[2] Earlier on May 9 before the incident, Dr. Boyce "was conducting her morning rounds in [the mental health unit], and she said to [Muhammad], 'I received your grievance yesterday.'"  Based on Dr. Boyce's body language, "it appeared [to Muhammad] that [Dr.] Boyce was displeased about [his] grievance."  In her declaration, Dr. Boyce denied ever divulging the contents of Muhammad's grievance to any officer.

Officer Turner released his grip and was no longer touching Muhammad.[3]

Muhammad also avers that Officer Turner "said in a soft, low and passive tone, 'have a seat'" on one of the stools. Muhammad understood this to be an "option" to sit down, not an order.  Muhammad responded, "no, I'm going to stand up," and continued talking.  Officer Turner did not tell Muhammad to sit a second time.

At this point, the video shows Officer Turner and Muhammad simply standing next to each other, with Officer Turner standing slightly behind Muhammad's left side.[4]  There is no resistance shown by the handcuffed Muhammad.  Yet, all of a sudden, Officer Turner conducted a forcible takedown of the handcuffed Muhammad, slamming him to the concrete floor. Specifically, Officer Turner (1) grabbed Muhammad's left arm; (2) stepped forward while simultaneously rotating his body very closely around Muhammad's left side; (3) pushed Muhammad's torso slightly to the right (away from Officer Turner); (4) used his

[3] Officer Turner contends the video shows he maintained his "custodial grip" on Muhammad while they stood at the table.  Because their backs were to the security camera, any clear view of Officer Turner's hands was obstructed.  At this stage, we must credit Muhammad's version of events—that Officer Turner released his grip—as the video does not contradict it.

[4] During his deposition, Muhammad thought that Officer Turner had taken multiple steps away from him after Officer Turner softly said, "have a seat." After reviewing the video footage, Muhammad agreed in his affidavit that Officer Turner was standing immediately next to him.

8                      Opinion of the Court                    24-12479

leg to trip Muhammad and forcibly sweep Muhammad's legs out
from under him; and (5) slammed Muhammad onto the concrete
floor of the common area. Muhammad hit the concrete floor hard
on his right shoulder and his glasses flew off his face.[5]

What happens next on the floor is Officer Turner's
intentional infliction of pain and pressure against Muhammad,
despite the fact that Muhammad was handcuffed, non-resistant,
and pinned down on his stomach. Nothing in the video indicates
that Muhammad offered any resistance once Officer Turner threw
him to the floor.

After the takedown, Officer Turner (1) quickly flipped
Muhammad over, putting him face-down on his stomach against
the floor; (2) applied "substantial pressure and weight on
[Muhammad's] back"; and (3) used his hand to push the "whole

---

[5] Officer Turner argues the video clearly shows that (1) he maintained his grip
on Muhammad's left arm and attempted to physically guide Muhammad into
a seated position at the table; (2) Muhammad then pulled away to the right in
reaction to his physical guidance; and (3) he appropriately reacted to
Muhammad pulling away from him by utilizing "a reactionary use of force to
bring Muhammad into compliance," which placed Muhammad on the
ground. Officer Turner stated largely the same in his declaration. In their
incident reports, other officers state they heard Officer Turner say "do not pull
from me."

The video is far from clear as to what happened in these couple of seconds. In
the light most favorable to Muhammad, he is simply standing next to Officer
Turner, is fully handcuffed, and is pushed slightly to the right by Officer
Turner before Officer Turner takes him down.

right side of [Muhammad's face] into the ground" with his thumb pressed under Muhammad's left ear.

Officer Turner's thumb pressure behind Muhammad's left ear is what Muhammad calls the "pain compliance technique." In an interrogatory, Muhammad asked Officer Turner: "Has FDC or a professional ever trained you on applying pressure to a person's neck, and/or on using pressure point techniques on a person's head and/or neck?" Officer Turner answered: "Yes, only as to a pressure point in the hollow behind the ear." Officer Turner described it, saying: "the pressure point maneuver [in the hollow behind the ear] *is used to control resistant behavior by using pain compliance*." Officer Turner elaborated further that "[p]ressure or leverage is applied using a fingertip or thumb tip to target a nerve, joint, or sensitive area, causing pain and compliance to verbal direction."

Seconds after the takedown, the other officers rushed to Officer Turner and assisted in holding Muhammad pinned down at different points of his body. Muhammad's body and the specific points of connection with the other officers were obscured in the security camera video by the officers' bodies. One of the officers placed shackles on Muhammad's feet.

An officer, whom Muhammad could not see, asked if they should let Muhammad up, and Officer Turner replied, "No." In addition to Officer Turner's pain compliance technique behind Muhammad's left ear, the continued pressure and weight by Officer Turner on Muhammad's back and head caused "severe pain" and made Muhammad feel like Officer Turner was

suffocating him.  When Muhammad told Officer Turner he could not breathe, Officer Turner replied, "This is only the beginning."

The officers maintained their position around and on top of Muhammad with small adjustments for approximately two minutes.  During that time, (1) two officers stood up, (2) officers engaged in conversation, and (3) at one point, an officer laughed. A few moments later, a supervisor, Lieutenant Gaines, entered the room.  Officer Turner reported on the situation to Lieutenant Gaines while Officer Turner and two officers continued to hold Muhammad pinned to the ground.  Eventually, the officers released Muhammad, picked him up, and seated him on a stool at the common area table.

### E.    Video of Post-Force Evaluation

At the common area table, Muhammad went through a post-force evaluation with a nurse while being held by two officers. The nurse (1) took Muhammad's vitals and (2) observed and palpated his body, without removing or looking under his shirt, causing her not to notice an abrasion on Muhammad's shoulder. Muhammad told her he "had pain in [his] face, right ear, neck and right shoulder."

After the examination, Muhammad was returned to his cell, and the restraints were removed from his feet and wrists.  Back in his cell, Muhammad found an abrasion on his shoulder where he hit the ground.  Three days later, Muhammad submitted a sick-call request, noting, *inter alia*, the abrasion on his right shoulder and lingering pain.

### F.      Events After the May 9, 2019 Incident

In the months after the May 9 incident, Muhammad reported continued and lingering shoulder pain to medical units multiple times and received an X-ray. Muhammad had restricted mobility in his right shoulder. Muhammad's shoulder pain finally subsided around October 2022, approximately three years later. Muhammad admitted that he refused pain medication after a doctor advised him "not to take pain medicine continuously or long-term for [his] chronic pain."

## II.  PROCEDURAL HISTORY

In September 2023, Muhammad *pro se* filed a second amended complaint (the "complaint") against Officer Turner in his individual capacity, raising two claims under 42 U.S.C. § 1983 that Officer Turner violated his Eighth Amendment rights by using unnecessary and excessive force in the May 9, 2019 incident. Muhammad's first claim was for the forcible takedown, and his second claim was for the escalated force and pain compliance technique on the floor.

Officer Turner answered the complaint and denied the allegations. Later, Officer Turner filed a motion for summary judgment, which contended, *inter alia*, that (1) Muhammad refused verbal commands to sit down and physically resisted Officer Turner, and (2) Officer Turner used force as discipline to effectuate Muhammad's compliance with his verbal commands.

In response, Muhammad argued that he was handcuffed and never resisted or did anything to warrant the force used by Officer

Turner.    Still, Officer Turner executed a forcible takedown, slamming Muhammad to the concrete floor, and then intentionally inflicted pain on Muhammad on the ground.

## A.    The Magistrate Judge's Report & Recommendation

The magistrate judge issued a report and recommendation ("R&R"), recommending that Officer Turner's motion for summary judgment be granted.  The magistrate judge considered Muhammad's claims as only one use-of-force claim because the force occurred as part of one episode lasting two minutes.

The magistrate judge found that the video of the incident clearly contradicted Muhammad's version of events.    The magistrate judge interpreted the video as showing that (1) Officer Turner did not release Muhammad's left arm but instead was holding Muhammad's left arm the entire time; (2) Officer Turner did not push Muhammad but rather Muhammad "took a step to the right in an effort to pull away from [Officer Turner]"; and (3) Officer Turner "used minimum force in a good-faith effort to maintain control and order."

The magistrate judge stressed that Muhammad did not deny that Officer Turner told him to "have a seat" and Muhammad did not sit but remained standing.  So the magistrate judge concluded that (1) "[t]he incident was . . . a disciplinary maneuver because [Muhammad] refused to sit" on the stool; and (2) "the force used was minimal, did not cause serious injury, and could not be considered repugnant to the conscience of mankind."

## B.    District Court's Order

Muhammad filed twenty-nine separately listed objections to the R&R.  Muhammad argued, *inter alia*, that the magistrate judge (1) erroneously discredited Muhammad's version of events; (2) disregarded multiple pieces of evidence; (3) viewed the evidence in the light most favorable to Officer Turner; (4) wrongly concluded that the videos did not support Muhammad's version of events; and (5) resolved disputes of material fact in favor of Officer Turner.

After reviewing Muhammad's objections, the district court summarily adopted the R&R and granted Officer Turner's motion for summary judgment.  Neither the magistrate judge nor the district court addressed qualified immunity.

Muhammad timely appealed.  Post-briefing in this Court, we appointed counsel for Muhammad.

## III.  STANDARD OF REVIEW

"We review the district court's grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the non-moving party."  *Guevara v. Lafise Corp.*, 127 F.4th 824, 828 (11th Cir. 2025).  Summary judgment is appropriate only if "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *Nehme v. Fla. Int'l Univ. Bd. of Trs.*, 121 F.4th 1379, 1383 (11th Cir. 2024) (same).

## IV.  SECTION 1983 CLAIMS

Muhammad brought two claims under 42 U.S.C. § 1983 against Officer Turner for violating his Eighth Amendment rights by allegedly using unnecessary and excessive force in the May 9, 2019 incident.  Muhammad's first claim was for the forcible takedown, and his second claim was for the escalated force, especially the pain compliance technique, once Muhammad was on the ground.  As explained below, we conclude that material issues of fact exist on both claims, precluding summary judgment at this stage.

### A.    Eighth Amendment

To prevail on a § 1983 civil rights action, "a plaintiff must show that he . . . was deprived of a federal right by a person acting under color of state law."  *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).  The use of excessive force by a prison official violates an inmate's Eighth Amendment right to be free from cruel and unusual punishment.  *Thomas v. Bryant*, 614 F.3d 1288, 1303-04 (11th Cir. 2010); *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999).  In the prison setting, excessive force claims require an objective and subjective showing.  *Thomas*, 614 F.3d at 1304.

The plaintiff must (1) show an objective harm "sufficiently serious to constitute a denial of the minimal civilized measure of life's necessities," and (2) make "a subjective showing that the official had a sufficiently culpable state of mind."  *Id.* (citation modified).  Both inquiries are contextual, and the objective harm inquiry is responsive to contemporary standards of decency.  *Id.*

As to the subjective component, this Court recognizes that it "must . . . give a wide range of deference to prison officials acting to preserve discipline and security." *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (citation modified). In order to establish an Eighth Amendment excessive force claim, a plaintiff inmate "must prove that force was applied *maliciously and sadistically for the very purpose of causing harm*." *Campbell*, 169 F.3d at 1374 (citation modified and emphasis added).

To distinguish between legitimate and excessive force, this Court asks whether the force "is applied in a good faith effort to maintain or restore discipline [or is applied] maliciously and sadistically to cause harm." *Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

To determine whether force was used "maliciously and sadistically," this Court considers five factors:

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of the injury inflicted upon the prisoner"; (4) "the extent of the threat to the safety of staff and inmates"; and (5) "any efforts made to temper the severity of a forceful response."

*Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (quoting *Cockrell*, 510 F.3d at 1311).

The severity of a prisoner's injury is relevant, but it is not the sole focus of the inquiry; instead, this Court focuses more on the force applied. *See id.* ("The focus of our Eighth Amendment inquiry is on the nature of the force applied, not on the extent of the injury inflicted."). Where prison officials maliciously and sadistically apply force to cause harm, they "always" violate contemporary standards of decency, even in the absence of "significant injury." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). Nonetheless, "[t]he extent of injury may also provide some indication of the amount of force applied." *Id.* And if an inmate succeeds in establishing liability, "the relatively modest nature of his alleged injuries [may] no doubt limit the damages he may recover." *Id.* at 40.

This Court also examines facts surrounding the incident that might elucidate the defendant's subjective mental state. For example, "threatening comments are circumstantial evidence of mental state" that can illuminate a defendant's motivation for using force. *Cockrell*, 510 F.3d at 1312.

Lastly, the "use of force must stop when the need for it to maintain or restore discipline no longer exists." *Skrtich*, 280 F.3d at 1304. How long force "may be continued calls for the exercise of good judgment on the part of prison officials." *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991).

## B.     The Forcible Takedown—Muhammad's First Claim

Muhammad's first claim is for Officer Turner's forcible

24-12479                Opinion of the Court                17

takedown, slamming him to the concrete floor.

After leading Muhammad from his cell, Officer Turner in a "soft" voice stated to Muhammad "have a seat" on one of the stools. Muhammad responded that he preferred to stand. Muhammad understood "have a seat" as an "option" to sit while they searched his cell. There is no audio contradicting Muhammad's affidavit that Officer Turner spoke softly and did not ask a second time.

In any event, within a few seconds of arriving at the table, Officer Turner suddenly did a violent takedown of Muhammad, slamming him to the concrete floor. In doing so, Officer Turner grabbed Muhammad's left arm and used his leg to sweep Muhammad's legs and feet out from under him, so that Muhammad hit the floor hard, especially on his shoulder.

Even assuming Officer Turner's "have a seat" was a verbal order to sit, the evidence (in the light most favorable to Muhammad) shows Officer Turner had no need to use force. Muhammad (1) was already handcuffed behind his back; (2) was the only inmate in the common area; and (3) had not done anything to indicate a threat to the safety of Officer Turner, the staff, or other inmates. The video does not blatantly or clearly contradict Muhammad's story that (1) Officer Turner released his grip and (2) Muhammad did not pull away from, or physically resist, Officer Turner.

Even if Officer Turner perceived a need to discipline Muhammad for not immediately following his "soft" verbal

instruction to sit, the amount of force used—violently taking Muhammad down to the concrete floor—bore no relationship to the handcuffed Muhammad's conduct of not immediately following that verbal order. Because Muhammad disputes that he pulled away from, or physically resisted, Officer Turner, no penological justification existed for the use of force, especially a violent takedown to the concrete floor. And, under governing regulations, an inmate's verbal resistance to an order is not an enumerated circumstance when correctional officers are authorized to use force by the FDC.[6] The gratuitous use of force and infliction of pain without penological justification meets the objective harm standard for excessive force claims. *See Sears*, 922 F.3d at 1209; *Skrtich*, 280 F.3d at 1302, 1304-05.

While Officer Turner claims he did the takedown as a disciplinary maneuver, Muhammad points to his deposition testimony that (1) while in his cell, Officer Turner told him that he was "going to pay for" the grievance he wrote; and (2) when Muhammad was on the ground and could not breathe, Officer

---

[6] In an interrogatory response, Officer Turner stated that he is "personally familiar with" Rule 33-602.210 of the Florida Administrative Code. Among other things, that rule describes when Florida correctional officers are authorized to use force against inmates. Fla. Admin. Code R. 33-602.210(2)(a). Relevant here, the use of force is authorized to "[o]vercome an inmate's *physical* resistance to a lawful order." *Id*. R. 33-602.210(2)(a)(6) (emphasis added). In other words, verbal resistance to an order is not an enumerated circumstance where force is authorized by the FDC. This aligns with the rule's later admonishment that "[v]erbal abuse alone is not a sufficient basis to authorize the use of force." *Id*. R. 33-602.210(2)(e).

Turner told him, "This is only the beginning." This evidence creates a material fact issue as to Officer Turner's subjective intent in using force that day. *See Cockrell*, 510 F.3d at 1312.

We recognize that Officer Turner also argues that the video clearly shows that (1) he told Muhammad to sit; (2) Muhammad refused to sit down; (3) he maintained his custodial grip on Muhammad; (4) with that grip, he attempted to physically guide Muhammad into a seated position at the table; (5) Muhammad then pulled away in reaction to Officer Turner's physical guidance; and (6) he appropriately reacted by utilizing "a reactionary use of force to bring Muhammad into compliance," which placed Muhammad on the ground.

The problem for Officer Turner is that the video has obstructed views, including of Officer Turner's hands, and lacks meaningful audio to capture the dialogue between Muhammad and himself. *Cf. Pourmoghani-Esfahani*, 625 F.3d at 1315 (stating the video is "not obviously contradictory because it fails to convey spoken words or tone and because it sometimes fails to provide an unobstructed view of the events"). As such, the video is ambiguous and does not clearly contradict Muhammad's story that Officer Turner had released his grip and Muhammad did not pull away from, or physically resist, Officer Turner. *Cf. Castro-Reyes*, 166 F.4th at 890 ("The videos thus contain ambiguities, which we must construe in favor of [the plaintiff].").

Viewing the evidence in the light most favorable to Muhammad, a reasonable jury could find that (1) Officer Turner

had no penological need to conduct a violent takedown of Muhammad, slamming him to the concrete floor; and (2) Officer Turner's intent in doing so was to make Muhammad pay for filing a grievance the day before. Accordingly, a reasonable jury could also find that Officer Turner (1) did not act in good faith to maintain discipline and (2) used "force maliciously or sadistically for the very purpose of causing harm." *Skrtich*, 280 F.3d at 1304-05; *see also Sconiers v. Lockhart*, 946 F.3d 1256, 1268 (11th Cir. 2020) ("Pepper-spraying and slamming a person to the ground without penological justification certainly offends common standards of decency."). We thus must reverse the district court's grant of summary judgment to Officer Turner on Muhammad's takedown claim.

## C.    Force on the Ground—Muhammad's Second Claim

Muhammad's second claim is for Officer Turner's escalated use of force once Muhammad was on the concrete floor.

Within seconds of hitting the concrete floor, Muhammad was lying face-down on his stomach, remained handcuffed, and was not resisting. Despite this non-resistance, Officer Turner (1) placed "substantial pressure and weight on [Muhammad's] back"; (2) used his hand to push the "whole right side of [Muhammad's head] into the ground"; and (3) placed and pressed his thumb under Muhammad's left ear in what is called the pain compliance technique, discussed above. Officer Turner described this technique as a maneuver "applied" to "caus[e] pain and compliance to verbal direction." Muhammad avers that (1) Officer

Turner's escalated force rendered him feeling like he was suffocating and in severe pain for nearly two minutes once he was on the floor; and (2) when he told Officer Turner he could not breathe, Officer Turner replied, "This is only the beginning."

Because the officers' bodies obstructed the security camera's view of the events on the concrete floor, the video does not contradict Muhammad's claims of Officer Turner's unnecessary and excessive force once Muhammad was face-down on the floor, still handcuffed, and non-resistant.

None of the officers reported that Muhammad struggled once he was on the ground. The video actually shows that (1) two officers released their hold on Muhammad quickly and appeared to calmly talk with each other, and (2) one officer even laughed in the situation. Officer Turner still continued to apply unnecessary and excessive force, including his pain compliance technique, on the compliant Muhammad.

Notably too, Officer Turner does not substantively challenge Muhammad's claim about Officer Turner's escalated force on him once on the ground. For instance, Officer Turner does not address Muhammad's testimony that Officer Turner applied the pain compliance technique and that Muhammad could not breathe. Rather, Officer Turner seems to argue that if the takedown was not excessive force, then Muhammad has no viable claim about what happened once he was on the ground. This ignores the fact that even if the violent takedown was not excessive, the use of force must stop when the need for it no longer

existed. *Skrtich*, 280 F.3d at 1304; *Williams*, 943 F.2d at 1576. Thus, Officer Turner's use of excessive and unnecessary force against Muhammad on the floor alone would constitute an Eighth Amendment violation.

In short, after the takedown, Muhammad was on the floor, face-down, and still handcuffed. Muhammad was not struggling or resisting, and no force was necessary, much less justified. While Officer Turner relies on the video of Muhammad on the ground, as did the district court, the video, if anything, supports Muhammad's excessive force claim. A reasonable jury could find that (1) Muhammad was face-down on the floor, handcuffed behind his back, and not resisting; (2) Officer Turner had no penological need for the escalated, or any, force once Muhammad was on the floor; and (3) the force was maliciously and sadistically inflicted on the compliant Muhammad on the concrete floor.

Therefore, "[e]ven if [Muhammad's] sworn statements turn out to be exaggerations or false," those statements "are enough to raise a genuine issue of material fact about the amount of force [Officer Turner] used and whether he applied it in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Sears*, 922 F.3d at 1209 (citation modified). We also reverse the district court's grant of summary judgment to Officer Turner on this second claim.

## V.  QUALIFIED IMMUNITY

The district court did not address Officer Turner's qualified immunity defense, which he maintains on appeal.  In the interest of judicial economy, we address qualified immunity.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Where a defendant correctional officer was operating within the scope of his discretionary authority, the plaintiff bears the burden of demonstrating that qualified immunity is not appropriate.  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014); *Kesinger ex rel. Est. of Kesinger v. Herrington*, 381 F.3d 1243, 1247-48 (11th Cir. 2004).

It is undisputed that Officer Turner was acting in his discretionary authority.  Muhammad thus bears the burden of demonstrating that: (1) Officer Turner violated his constitutional right under the Eighth Amendment, and (2) the violation of that right was clearly established.  *Caldwell*, 748 F.3d at 1099.

As to the clearly-established prong, Muhammad must show that his constitutional right under the Eighth Amendment was clearly established in light of the specific context of the case, not as a broad general proposition, at the time of Officer Turner's actions, so as to have provided fair notice to Officer Turner that he violated

Muhammad's rights. *Skrtich*, 280 F.3d at 1303-04. For these purposes, clearly established law consists of holdings of the Supreme Court, the Eleventh Circuit, or the highest court in the state where the incident occurred. *Caldwell*, 748 F.3d at 1102 n.14.

Muhammad satisfies both requirements. As to his constitutional right under the Eighth Amendment, the record evidence is sufficient to raise a genuine issue of material fact about whether Officer Turner's use of force was (1) necessary and applied in a good-faith effort to maintain or restore discipline; or (2) unnecessary or excessive and applied maliciously and sadistically to cause harm. *See Sears*, 922 F.3d at 1205, 1209.

Muhammad also demonstrated that this Eighth Amendment right to be free from such unnecessary and excessive force was clearly established at the time of the May 9, 2019 incident. *See, e.g.*, *Hudson*, 503 U.S. at 4 ("This case requires us to decide whether the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [under the Eighth Amendment even] when the inmate does not suffer serious injury. We answer that question in the affirmative."); *Skrtich*, 280 F.3d at 1301 ("In this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court . . . ." (citation omitted)); *id.* at 1303 ("By 1998, our precedent clearly established that government officials may not use gratuitous force against a prisoner who has

been already subdued or, as in this case, incapacitated."); *Williams*, 943 F.2d at 1576 ("[O]nce the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments, and any abuse directed at the prisoner after he terminates his resistance to authority is an Eighth Amendment violation.").

We conclude that Officer Turner is not entitled to summary judgment based on qualified immunity. Further, if a jury concludes that Officer Turner used excessive force maliciously and sadistically in violation of Muhammad's Eighth Amendment rights, the qualified immunity defense is not available.

## VI.  CONCLUSION

For the foregoing reasons, we (1) reverse the district court's grant of summary judgment to Officer Turner; (2) determine that the evidence, viewed in the light most favorable to Muhammad, creates genuine issues of material fact as to Officer Turner's violation of Muhammad's Eighth Amendment rights; (3) conclude Officer Turner is not entitled to qualified immunity; and (4) remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**